IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

OREGON WILD, an Oregon
non-profit corporation; FRIENDS
OF LIVING OREGON WATERS,
an Oregon non-profit corporation; and
WESTERN WATERSHEDS PROJECT,
an Oregon non-profit corporation,

Case No. 1:15-cv-01360-CL

Plaintiffs,

v.

ORDER

CONSTANCE CUMMINS,
Forest Supervisor, Fremont-Winema
National Forests; U.S. FOREST SERVICE,
a federal agency; LAURIE R. SADA,
Field Supervisor, Klamath Falls Office, U.S.
Fish & Wildlife Service; and U.S. FISH &
WILDLIFE SERVICE, a federal agency,

Defendants,

ED GARRETT RANCH, INC., an Oregon
Corporation; PHILIP GROHS, dba Grohs
Ranch; MATT OWENS, an individual;
ADAM OWENS, an individual; KNESS
CATTLE, INC., an Oregon Corporation;
STEVE SIMMONS, an individual;

HOLIDAY RANCHES, INC., a
California Corporation; and C&A
VOGT COMMUNITY PROPERTY
TRUST, a California Trust,

Intervenor-Defendants.

CLARKE, Magistrate Judge

Plaintiffs Oregon Wild, Friends of Living Oregon Waters, and Western Watersheds Project (collectively, "Plaintiffs") bring this suit against Defendants Constance Cummins, the United States Forest Service, Laurie R. Sada, and the United States Fish and Wildlife Service (collectively, "Defendants"). Ed Garrett Ranch, Inc.; Philip Grohs; Matt Owens; Adam Owens; Kness Cattle, Inc.; Steve Simmons; Holiday Ranches, Inc.; and C & A Vogt Community Property Trust (collectively, "Intervenor-Defendants") timely intervened. Plaintiffs allege Defendants violated and are violating the Endangered Species Act ("ESA"), the National Forest Management Act ("NFMA"), and the National Environmental Policy Act ("NEPA"). This case comes before the Court on Plaintiffs' motion for summary judgment (#23), Defendants' cross-motion for summary judgment (#32), and Intervenor-Defendants' cross-motion for summary judgment (#35). For the reasons below, Defendants' and Intervenor-Defendants' motions are GRANTED and Plaintiffs' motion is DENIED.[1]

## FACTUAL BACKGROUND

Livestock have grazed on the Lost River and Sprague Watersheds, part of the Upper Klamath Basin, since the late 1800s. Much of the area is now incorporated into the Fremont-Winema National Forests. Congress requires the Forest Service "to consider the use of National Forest lands for grazing of livestock." *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089,

---

[1]The parties have consented to Magistrate Judge jurisdiction over this action pursuant to 28 U.S.C. § 636(c)(1).

1097 (9th Cir. 2003) (citing 16 U.S.C. § 531 & 16 U.S.C. § 1604(e)(1)). "The Forest Service manages livestock grazing on an allotment by issuing a grazing permit; an allotment management plan (AMP); and an annual operating … instruction (AOI)." *Or. Nat. Desert Ass'n v. Sabo*, 854 F.Supp.2d 889, 902 (D. Or. 2012). Grazing permits authorize livestock use on federal lands and set limits on the allowable timing and amount of that use. *Id.* The Forest Service generally issues permits for ten-year periods. *Id.* AMPs are allotment-specific planning documents that:

> (i) Prescribe[] the manner in and extent to which livestock operations will be conducted in order to meet the multiple-use, sustained yield, economic, and other needs and objectives as determined for the lands, involved; and
> (ii) Describe[] the type, location, ownership, and general specifications for the range improvements in place or to be installed and maintained on the lands to meet the livestock grazing and other objectives of land management; and
> (iii) Contain[] such other provisions relating to livestock grazing and other objectives as may be prescribed by the Chief, Forest Service, consistent with applicable law.

36 C.F.R. § 222.1(b)(2). As their name implies, AOIs are agreements issued annually by the Forest Service to permittees. *Sabo*, 854 F.Supp.2d at 902. The Forest Service uses AOIs to respond to changing grazing conditions such as drought, water quality, habitat restoration, or risks to threatened plants or animals. *Id.*

In 1988, the Lost River sucker and shortnose sucker, fishes endemic to the Klamath Basin of south-central Oregon and north-central California, were classified as endangered species under the ESA by the U.S. Fish and Wildlife Service ("FWS"). 53 Fed. Reg. 27130-01 (Jul. 18, 1988). In issuing its final rule, FWS noted both species' numbers and range had been reduced by more than 95 percent due to "[d]ams, draining of marshes, diversion of rivers and dredging of lakes. . . ." *Id.* at 27130. Moreover, "hybridization with more common closely related species, competition and predation by exotic species, and insularization of remaining habitats" eminently

threatened both species through continued loss of habitat. *Id.* "Further problems," the agency noted, "may have been caused by decreases in water quality that result from timber harvest, . . . removal of riparian vegetation and livestock grazing." *Id.* at 27132. Accordingly, FWS labeled livestock grazing on Forest Service land located in the Upper Klamath Lake and Clear Lake Reservoir watersheds as "[f]ederal actions that may affect the shortnose sucker and Lost River sucker. . . ." *Id.* at 27133.

Both sucker species spend the majority of their time in "lake environments." FWS 6762. In late winter and early spring of each year, however, both species migrate to tributaries to spawn. After hatching, the larvae "drift" downstream from the tributaries to the lakes; larvae typically "spend little time in rivers" before drifting back into their open-water habitats. FWS 6773. But because the larvae drift downstream after hatching, adequate water flow within tributaries is critical to survival, and insufficient flow can, among other things, prevent access to breeding habitat, cause the species' eggs to dry out, and strand adults suckers who have already spawned. Consistent, and sufficient, water flow is largely an uncertainty in the Upper Klamath Basin due to the area's environment, which experiences warm, dry summers and cold, wet winters; tributaries often dry out or retain little water come summer.

To make matters more uncertain for suckers, the Upper Klamath Basin has experienced significant drought conditions over the last few years; the water levels of Gerber and Clear Lake Reservoirs, two bodies of water with high concentrations of both sucker species, were significantly below average prior to summer 2014. The water levels were lower still prior to summer 2015. In addition, summer 2014 streamflow in the Basin was estimated to be merely 6 to 47 percent average flow. The federal government declared a severe drought in the Basin. The species are, however, "adapted to weather periodic droughts," FWS 6794, though the potential

for increased droughts in the Upper Klamath Basin resulting from climate change appears to be a significant variable going forward, having the potential to place a larger strain on both sucker species, with decreased water "flows during late spring, summer, and early fall. . . ." P 7210.

Plaintiffs have challenged the Forest Service's decision to continue to approve livestock grazing on eight allotments they contend "contain designated critical habitat for shortnose suckers and/or are upstream of habitat for both species." Compl. ¶ 2 [ECF No. 1.]. The eight allotments are the Arkansas, Yocum Valley, Fort Springs, Horesfly, Pitchlog, Privy Springs, Yainax Butte, and Wildhorse allotments. Plaintiffs argue the combination of grazing with man-made water diversions and impoundments found throughout the Fremont-Winema National Forests, as well as on private land, "has a significant effect on suckers, degrading their instream habitat and reducing water levels in the reservoirs." Compl. ¶ 2.

**A. Endangered Species Act Consultation**

Because of their ESA protection, the Forest Service must insure their actions, including the granting of permits for grazing, are "not likely to jeopardize the continued existence of" suckers "or result in the destruction or adverse modification of [suckers'] habitat." 16 U.S.C. § 1536(a)(2). The Forest Service fulfills this obligation by consulting with a designated wildlife agency prior to undertaking any action that may affect suckers or their critical habitat. The ESA and its implementing regulations provide a framework for this interagency consultation. First, the Forest Service, as the acting agency, prepares a biological assessment ("BA"), which evaluates potential effects of the proposed action on suckers or their critical habitat. If the Forest Service determines that the effects of the proposed action are unlikely to adversely affect suckers or their critical habitat, and the consulting agency agrees, the consultation process concludes without any additional action required. This is termed an informal consultation. By contrast, a "formal

consultation" is required where a proposed action is "likely to adversely affect" suckers or their critical habitat. 50 C.F.R. § 402.14(a)-(c). Formal consultation requires a formal biological opinion ("BiOp") from the consulting agency to determine "whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of [suckers] in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(4).

On multiple occasions, the Forest Service consulted FWS regarding the effects of authorized grazing on suckers and their critical habitat. In 2007, the Forest Service determined that grazing was likely to adversely affect suckers on five allotments at issue here: Yocum Valley, Pitchlog, Wildhorse, Arkansas, and Yainax Butte. Accordingly, FWS prepared a BiOp assessing the matter. In its BiOp, FWS concluded that grazing on the five allotments was "likely to have some direct and indirect adverse effects" to shortnose suckers. FWS 2305. Potential adverse effects included: (1) water-quality reductions, "such as lower dissolved oxygen concentrations, higher water temperatures, and higher levels of suspended sediment"; (2) hydrogeomorphic changes, "such as reductions in summer base flows, increase in flood-lows, and alterations of stream morphology, including reduction/loss of critical fish habitats such as spawning and rearing areas"; and (3) ecological changes, "such as reductions in invertebrate prey, increases in exotic predators and competitors, and increases in pathogens and parasites." FWS 2288.

As to the remaining allotments assessed in the 2007 consultation, the Forest Service concluded that grazing was not likely to adversely affect suckers or adversely modify or destroy their critical habitat. FWS concurred in part, agreeing that grazing would not adversely affect suckers; however, it found grazing would likely adversely modify or destroy their critical habitat "because it [would] likely incrementally reduce[] the amount of water of sufficient quantity and

Page 6 – ORDER

suitable quality; degrade[] physical habitat for spawning, feeding, rearing, and travel corridors; and adversely impact the biological environment. . . ." FWS 2310-11. This finding, however, was non-binding and merely advisory because FWS had not finalized the contours of the suckers' critical habitat at the time the finding was made.

By December 2012, FWS's critical-habitat designation was finalized. The designated habitat differed from that originally proposed by FWS. Thus, in 2014, the Forest Service re-consulted FWS in an effort to assess grazing's effects on the newly designated critical habitat. The 2014 BA analyzed grazing's effects on nine pastures found on six allotments at issue in this case: the Arkansas, Horesfly, Pitchlog, Wildhorse, Yanaix Butte, and Yocum Valley allotments. In the BA, the Forest Service acknowledged grazing's adverse impacts on water quality and quantity and that past grazing affected critical habitat on the allotments; as it stated:

> Past grazing has led to biomass removal and trampling, alterations in species composition, compaction of soils, changes in fuel loading and the fire regime, down cutting of riparian areas with subsequent drying of adjacent meadows, and noxious weed invasion. Within riparian areas and wet meadows, livestock grazing has led to churning of the soil and hummocks. . . . Livestock grazing indirectly leads to an increase in stream temperatures through lower summer flows, widening of the stream channel (thus exposing more water surface to solar radiation) increased solar exposure due to reduced shade from lack of streamside vegetation and to loss of undercut streambanks.

P 7204, 7208. Nonetheless, the Forest Service determined grazing was not likely to adversely affect critical habitat on any of the pastures within the six allotments. First, the Forest Service concluded that natural conditions, not grazing, dictated water quality and quantity in critical-habitat areas; the Forest Service stated, "grazing . . . does not create the intermittent, seasonal nature" of the various tributaries relied upon by suckers; instead, the intermittent nature of the tributaries is caused by natural conditions that constrain suckers, and, therefore, "continued grazing . . . would have minimal effect . . . relative to the effect caused by the natural

conditions." P 7211. Finally, the Forest Service determined that adverse effects to critical habitat caused by grazing the pastures was being sufficiently minimized by fencing off critical habitat; by beavers, whose dam construction "increas[es] riparian vegetation and vigor"; and/or through altered grazing practices, such as shortened or early-season grazing. P 7210-7222.

FWS concurred with the Forest Service's analysis. In a letter of concurrence ("LOC"), FWS stated most grazing occurs in "late spring, summer, and fall" when there is inadequate water flow to support suckers and when most suckers have returned to their primary, open-water habitats. FWS 2772. Additionally, FWS agreed with the Forest Service's conclusion that any adverse effects in the remaining pastures would be and already were minimized due to changes in grazing practices, such as fenced-off enclosures to protect critical habitat and "beaver dams that have altered the habitat to the benefit of suckers." FWS 2772.

The Forest Service's 2014 BA, which was a re-consultation of its 2007 ESA consultation, requested ESA coverage for the 2014 through the 2016 grazing season. The Forest Service's "request for re-consultation rather than re-initiation [was] due to the dramatic difference in the number of acres of proposed critical habitat from that that was actually designated critical habitat . . . ." P 7196. In merely re-consulting rather than re-initiating consultation, the Forest Service continued to follow the "ten-year cycle for re-initiation of consultation. . . ." P 7196. Accordingly, the Forest Service must complete a new ESA consultation prior to any livestock grazing in 2017. *See* 16 U.S.C. § 1536(a)(2) (stating every federal agency has a duty to engage in consultation to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence" of any species listed as endangered or threatened; 50 C.F.R. § 402.16 (stating the duty of consultation is an ongoing duty of consultation).

## B. 2009 Environmental Assessment

In 2009, the Forest Service completed an environmental assessment ("EA") under NEPA. The EA analyzed "the direct, indirect, and cumulative environmental impacts" of grazing on six allotments, five of which are at issue: the Arkansas, Pitchlog, Horsefly, Wildhorse, and Yocum Valley allotments. P 5527. The allotments are located in the Sprague and Lost River watersheds. To determine cumulative effects, "past, present, and reasonably foreseeable future activities were considered, along with proposed activities of the Lost River and Sprague Watersheds Grazing Allotment Project, to determine cumulative effects." P 5561.[2] Cumulative environmental impacts that were assessed included the effects of climate change; the increased intensity of summer droughts due to climate change's effects; as well as the effects of man-made impoundments such as roads, dams, and reservoirs. The EA's purpose was to use this information to assess grazing and non-grazing alternatives on each of the allotments. The EA concluded grazing would have no significant impact on the area assessed, a finding that cleared the way for continued grazing on the allotments. *See* P 5666-5691. Plaintiffs submitted comments during the EA's public comments period, raising concerns about the environmental impacts grazing posed on the area. They did not, however, appeal the Forest Service's finding that grazing would have no significant impact on the challenged allotments.

## LEGAL STANDARD

The parties have filed cross-motions for summary judgment under Federal Rule of Civil Procedure 56. In this context, "'[s]ummary judgment'" is "simply a convenient label to trigger" judicial review. *Klamath Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F.Supp.2d 1230, 1233 (D.

---

[2]Plaintiffs point out that the Forest Service "tiers" the 2007 FWS BiOP to the EA. The EA does make multiple references to the BiOP, a document which has not itself been subject to NEPA review. "[T]iering to a document that has not itself been subject to NEPA review is not permitted, for it circumvents the purpose of NEPA." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1073 (9th Cir. 2002). Accordingly, any assessment of the adequacy of the EA must be done without considering segments which are incorporated by reference from the BiOp.

Or. 2013), *aff'd sub nom. Klamath-Siskiyou Wildlands Ctr. v. Gerritsma*, No. 13-35811, 2016 WL 775297 (9th Cir. Feb. 29, 2016). The Administrative Procedure Act (APA) governs. It allows a court to set aside a final agency action only if it is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with the law[.]" 5 U.S.C. § 706(2)(A). "A decision is arbitrary and capricious if the agency 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *O'Keeffe's, Inc. v. U.S. Consumer Prod. Safety Comm'n*, 92 F.3d 940, 942 (9th Cir. 1996) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). An agency action is also arbitrary and capricious if the agency fails to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

Review under the APA is "searching and careful." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 858 (9th Cir. 2004) (internal citations and quotations omitted). The court must ensure that the agency took a "hard look" at the environmental consequences of its proposed action. *Or. Nat. Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997) (internal quotations and citations omitted). However, the court may not substitute its own judgment for that of the agency. *Ocean Advocates*, 402 F.3d at 858. It must presume the agency acted properly and affirm the agency when "'a reasonable basis exists for its decision.'" *Indep. Acceptance Co. v. Cal.*, 204 F.3d 1247, 1251 (9th Cir. 2000) (quoting *Cal. Hosp. Ass'n v. Schweiker*, 559 F. Supp. 110, 116 (C.D. Cal. 1982)).

## DISCUSSION

### I. Standing

At the outset, Defendants and Intervenor-Defendants contest Plaintiffs' "standing to challenge management of the Forest Service allotments at issue" in this case. Defs.' Cross-Mot. for Summ. J, at 18 [ECF No. 32.]. Specifically, they contend Plaintiffs have failed to establish standing, as no plaintiff has shown use of any of "the vast public lands within the challenged allotments—or any lands adjacent to the allotments." Defs.' Reply in Supp. of Its Cross-Mot. for Summ. J., at 2 [ECF No. 41.]. Thus, they argue, the Court should grant their motions for summary judgment against all of Plaintiffs' claims.

To establish standing, a plaintiff must demonstrate, "at an irreducible minimum," (1) that he personally suffered some actual or threatened injury (injury in fact); (2) that the injury can be traced to the challenged conduct of the defendant (causation); and (3) that the injury is likely to be redressed by a favorable judicial decision (redressability). *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982). An association has standing to bring suit on its members' behalf if: "[1] its members would have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 169 (2000). Critically, in a case brought under the ESA or another environmental-protection statute, the injury is not to the environment but to the plaintiff. *Id.*

In *Laidlaw*, the Supreme Court determined standing existed based on affidavits from association members stating "use [of] the affected area" and that the affiants were "persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged

activity." *Id.* at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). In that case, multiple environmental organizations brought suit under the citizen suit provision of the Clean Water Act for injunctive relief and civil penalties. *Id.* at 176-77. The plaintiffs alleged the defendant was violating its NPDES permit at a hazardous waste incinerator located on the banks of a river. *Id.* Several members of the plaintiff organizations filed declarations, which detailed the injury they had or that they would suffer because of the suspected pollution of the river. *Id.* at 181-83. Some members lived within two miles of the incinerator, one member lived 20 miles away, and others made no indication of where they lived but opined on their recreational use of the river. *Id.* In fact, one affiant claimed simply that he canoed 40-some miles downstream of the incinerator. *Id.* at 183. The Supreme Court held that these members had shown standing by demonstrating injuries to their aesthetic and recreational interests; indeed, they were people who "use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Id.* at 183 (quoting *Sierra Club*, 405 U.S. at 735).

Here, Plaintiffs, who are also associations, adequately establish standing through affidavits submitted by Plaintiffs' members asserting livestock grazing, approved by the Forest Service on the challenged allotments, adversely affects endangered suckers, thereby directly affecting the affiants' "aesthetic or recreational interest in a particular . . . animal." *Ecological Rights Found. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000). As in *Laidlaw*, several members of the plaintiff organizations have filed affidavits detailing the injury they have suffered as a result of the allegedly unlawful grazing activity at issue in this case. For instance, Joe Serres, a co-founder of Plaintiff Friends of Living Oregon Waters ("FLOW"), states he and FLOW's 223 southern Oregon members routinely visit grazing allotments and monitor "the environmental impact grazing has on public lands throughout Oregon, including the Fremont-

Winema National Forest." Serres Decl. ¶ 3 [ECF No. 26.]. They have been monitoring the lands and waters since 2002. Mr. Serres states that FLOW's interests in the particular area at issue in this case "serve [its] members' interest of protecting waterways from pollution," and that he, in his individual capacity, visits the affected areas for aesthetic, spiritual, and recreational reasons. Serres Decl. ¶ 5.

Likewise, George Wuerthner, a board member of Plaintiff Western Watersheds Project ("WWP"), states he "camp[s], fish[es], hunt[s], observe[s] wildlife, and hike[s] . . . land on the Fremont-Winema National Forest," Am. Wuerthner Decl. ¶ 4 [ECF No 27.], specifically the Lost River watershed, where the allotments at issue in this case are located. He states he has visited the Fremont-Winema National Forests more than a dozen times—and will continue to do so— witnessing firsthand the impacts grazing has had on "riparian and upland areas." Am. Wuerthner Decl. ¶ 4.

Defendants and Intervenor-Defendants argue, however, that the affiants make broad declarations about visiting "'parts of the Lost River watershed'" that are "'impacted by the grazing allotments at issue,'" but have never visited specific allotments in question here. Defs.' Cross-Mot. for Summ. J., at 19 (citing Serres Decl. ¶ 11). Defendants point out that Plaintiffs cannot satisfy standing requirements through "averments which state only that one of [the organizations'] members uses unspecified portions of an immense tract of territory . . . ." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990).

In *Summers v. Earth Island Inst.*, 555 U.S. 488, 494-95 (2009), The Supreme Court determined that conservation organizations lacked standing where the only viable affidavit submitted cited a past injury, unattached to any particular site in the national forests, and entirely unrelated to the regulations being challenged. By contrast, in *Ctr. for Biological Diversity v.*

*Kempthorne*, 588 F.3d 701, 707-08 (9th Cir. 2009), the Ninth Circuit found standing where conservation organizations' members alleged they had viewed polar bears and walruses in the "Beaufort Sea region, enjoy[ed] doing so, and h[ad] plans to return."

Plaintiffs' members' allegations, if true, are geographically specific enough to establish standing. First, unlike the conservation organizations in *Summers*, who provided a single affidavit unattached to any particular site in any national forest, Plaintiffs have provided multiple affidavits from individual members stating they have, on multiple occasions, traveled to the Fremont-Winema National Forests and specifically to the Lost River watershed, where the challenged allotments at issue are found. Moreover, much like the affiants in *Kempthorne*, who alleged they had viewed polar bears and walruses in the "Beaufort Sea region," the affiants in this case specifically allege they have viewed suckers in the Lost River watershed region, that they "enjoy doing so, and have plans to return."[3] *Kempthorne*, 588 F.3d at 708. If the affiants' declarations are true, their statements are not broad allegations; instead, they show their members are people who "use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Laidlaw*, 528 U.S. at 183 (quoting *Sierra Club*, 405 U.S. at 735). Accordingly, Plaintiffs have established standing.

## II.    Endangered Species Act

In their first claim, Plaintiffs challenge the 2014 re-consultation's conclusion that grazing is not likely to adversely affect suckers' critical habitat. They argue FWS's LOC is arbitrary,

---

[3]Defendants and Intervenor-Defendants argue that at least some affiants state no intent to return to the Lost River watershed. In direct contravention of this argument, however, declarant Paul Ruprecht expressly states he will return to the region "to observe conditions and look for suckers . . . [in April 2017], and again in late summer or fall of 2017. . . ." Sec. Ruprecht Decl. ¶ 28 [ECF No. 39.]. And, while declarant George Wuerthner states "the allotments in the Lost River watershed [have caused him to visit] less frequently than [he] otherwise [would] like to visit, he also states, "I would certainly want to visit the Lost River watershed and the allotments at issue here more frequently if the Forest Service did not authorize livestock grazing in these areas." Am. Wuerthner Decl. ¶ 12. Hence, based on these and other statements alluding to frequent visits to the Lost River watershed, the Court believes the declarants' statements are sufficient to establish an intent to return.

capricious, an abuse of discretion, and not in accordance with the ESA, thus violating the APA. Specifically, in moving for summary judgment, Plaintiffs argue "[t]he 2014 LOC, which explicitly and exclusively relied on the 2014 BA, is arbitrary and capricious" because the "[re-]consultation ignored significant data and other key factors when assessing the environmental baseline and the direct and indirect effects of grazing on critical habitat. . . ." Pls.' Mot. for Summ. J., at 13 [ECF No. 23.]. In short, Plaintiffs contend the agencies expressly ignored "the combined effects of grazing and water impoundments"; instead, the agencies "compared the effects of grazing to the degraded baseline caused by low water flows." Pls.' Mot. for Summ. J., at 13, 15 (emphasis in original).

Plaintiffs point to the Forest Service's reliance on continued grazing's "minimal effect . . . *relative* to the effect caused by the natural conditions," P 7211 (emphasis added), to find no significant threat to the species. As Plaintiffs point out, 50 C.F.R. § 402.02 requires the Forest Service to consider "direct and indirect effects of an action on the species or critical habitat, *together* with the effects of other activities that are interrelated or interdependent with that action. . . ." (emphasis added).

Moreover, along with an argument that the BA and LOC ignore conflicting monitoring data, Plaintiffs also take issue with the fact the Forest Service repeatedly justified their decision that grazing is not likely to adversely affect suckers or their critical habitat by citing to the presence of suckers in areas grazed by cattle. *See*, *e.g.*, P 7218 ("The fact that suckers are present when the [Primary Constituent Elements] are present is evidence that livestock grazing is not substantially impacting [shortnose sucker] critical habitat in these pastures"). Plaintiffs direct the Court to the Ninth Circuit's decision in *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 527 (9th Cir. 2010), where the court stated that the mere fact that a local population of threatened or

endangered species has survived over time does not, alone, "provide any information about how much longer it can hold on." Thus, Plaintiffs argue, the LOC, which adopted these findings in the EA, is arbitrary and capricious.

In their cross-motions for summary judgment, Defendants and Intervenor-Defendants make two arguments in response. First, they contend Plaintiffs' ESA claim is moot because the 2014 LOC covered only the 2014, 2015, and 2016 grazing seasons, and the Forest Service must complete a new ESA consultation prior to any livestock grazing in 2017. As such, "[n]o grazing actions that may affect suckers or their critical habitat will occur in 2017 until a new ESA consultation is complete." Defs.' Cross-Mot. for Summ. J., at 20-21. Second, they argue FWS's LOC was rational and supported by the administrative record.

## A. Mootness

A federal court lacks jurisdiction to decide a moot claim. *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992). "A claim is moot if it has lost its character as a present, live controversy." *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1123 (9th Cir. 1997) (internal citation omitted). "A case or controversy must exist at all stages of review. . . ." *Wolfson v. Brammer*, 616 F.3d 1045, 1053 (9th Cir. 2010). However, "the mere cessation of illegal activity in response to pending litigation does not moot a case, unless the party alleging mootness can show that the 'allegedly wrongful behavior could not be reasonably expected to recur.'" *Rosemere Neighborhood Ass'n v. U.S. Envtl. Prot. Agency*, 581 F.3d 1169, 1173 (9th Cir. 2009) (quoting *Laidlaw*, 528 U.S. at 189). Rather, "a case [] become[s] moot after it is filed, 'when . . . the parties lack a legally cognizable interest in the outcome'" or the issue is no longer "live." *Wolfson*, 616 F.3d at 1053 (quoting *Porter v. Jones*, 319 F.3d 483, 489 (9th Cir. 2003)). An issue is no longer live if "there is no longer a possibility that a[] [plaintiff] can obtain relief for his

claim. . . ." *Ruvalcaba v. City of Los Angeles*, 167 F.3d 514, 521 (9th Cir. 1999). The party asserting mootness bears a heavy burden to show "that there is no effective relief that the court can provide." *Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006) (citing *S. Or. Barter Fair v. Jackson Co.*, 372 F.3d 1128, 1134 (9th Cir. 2004)).

Plaintiffs' ESA claim is moot because the 2014 LOC covered only the 2014, 2015, and 2016 grazing seasons; thus, the Forest Service must complete a new ESA consultation prior to any livestock grazing in 2017. In fact, by law, the Forest Service must complete a new ESA consultation prior to issuing grazing permits. Section 7(a)(2) of the ESA requires every federal agency to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence" of any species listed as endangered or threatened. 16 U.S.C. § 1536(a)(2). In addition, every agency must insure its actions do not result in the destruction of any species' critical habitat. *Id.* The term "action" includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," which includes the granting of grazing permits. 50 C.F.R. § 402.02.

As discussed, grazing permits authorize livestock use on federal lands and set limits on the allowable timing and amount of that use. *Sabo*, 854 F. Supp. 2d at 902. The Forest Service generally issues permits for ten-year periods, *id.*, and, indeed, here, the Forest Service expressly states that it follows a "ten-year cycle for re-initiation of consultation. . . ." P 7196. Accordingly, the Forest Service must re-initiate ESA consultation every ten years, upon the issuing of new grazing permits. *See* 50 C.F.R. § 402.16 (stating that there is an ongoing duty of consultation and setting forth the circumstances under which consultation must be re-initiated).

In 2007, the Forest Service initiated an ESA consultation with the Fish and Wildlife Service ("FWS") to assess the impacts of authorized grazing on suckers and their critical habitat,

and FWS found grazing would likely adversely modify or destroy suckers' critical habitat in certain areas "because it [would] likely incrementally reduce[] the amount of water of sufficient quantity and suitable quality; degrade[] physical habitat for spawning, feeding, rearing, and travel corridors; and adversely impact the biological environment. . . ." FWS 2310-11. FWS's finding was nonbinding, however, due to the fact that FWS had not yet finalized its designation of sucker critical habitat; thus, the assessment was merely advisory. In December 2012, FWS finalized the boundaries of the suckers' critical habitat; the finalized habitat differed substantially from the habitat originally proposed by FWS. Consequently, in 2014, the Forest Service re-consulted FWS, and pursuant to the ESA's requirements, it prepared a BA, which evaluated grazing's potential effects on the newly designated critical habitat. FWS concurred with the Forest Service's analysis in a LOC.

The Forest Service's 2014 BA and ensuing LOC were part of a re-consultation of the 2007 ESA consultation and only provided ESA coverage for the 2014 through the 2016 grazing season. The Forest Service requested "re-consultation rather than re-initiation [] due to the dramatic difference in the number of acres of proposed critical habitat from that that was actually designated critical habitat . . . ." P 7196. In merely re-consulting rather than re-initiating consultation, however, the Forest Service continued to follow the "ten-year cycle for re-initiation of consultation. . . ." P 7196. The ten-year period has come and passed. Thus, as the Forest Service stated, the LOC has expired and it "w[ill] re-initiate consultation with the [FWS] for both [Lost River suckers] and [shortnose suckers] and their critical habitat" before allowing for grazing in 2017, as is required by Section 7(a)(2) of the ESA. P 7196; *see also* Brillenz Decl (stating grazing will not occur on the challenged allotments "until there is a new ESA determination with regard to the two ESA-listed sucker species"). Hence, the FWS's LOC has

expired and cannot, by law, control future grazing.[4] Because it will not control future grazing, no impacts to the suckers will occur based on the challenged LOC, and as such, no live controversy remains.

Indeed, in *Or. Nat. Desert Ass'n et al. v. U.S. Forest Serv. et al.*, Civ. No. 04-3096-PA, 2007 WL 1072112, at *1 (D. Or. April 3, 2007), this Court had occasion to address this very issue. There, the plaintiffs claimed the defendants' authorization of grazing in the Fremont-Winema National Forests violated the ESA. *Id.* at *3. The plaintiffs argued, among other things, that FWS's BiOps failed to properly incorporate Inland Native Fish Strategy standards, rendering the BiOps arbitrary and capricious and in violation of the APA. *Id.* The two BiOps had already expired, however, and "no livestock grazing actions that may affect the listed suckers or bull trout w[ould] occur . . . until [a new] consultation [was] complete[d]." *Id.* at *1 (internal citations and quotations omitted). As such, the defendants argued, the plaintiffs' ESA claims were moot. *Id.* at *4. In holding the claims moot, this Court noted that the Forest Service could not allow for additional grazing until the new ESA consultation had been completed. *Id.* at *4-*5. Because a new consultation had to take place before grazing occurred, the challenged BiOps had expired and could not possibly affect future grazing, rendering the plaintiffs' ESA claims, which were based on the expired BiOps, moot. *Id.* at *4-*5.

Here, much like *Natural Desert*, Plaintiffs challenge FWS's 2014 LOC's conclusion that grazing is not likely to adversely affect suckers' critical habitat. As in *Natural Desert*, however, where the challenged BiOps had already expired, the challenged LOC has already expired, and the Forest Service and FWS must complete a new ESA consultation prior to any livestock

---

[4]Plaintiffs state Defendants have not provided adequate assurance "they will actually complete a new consultation before the next grazing season. . . ." Pls.' Reply in Supp. of Its Mot. for Summ. J., at 13 [ECF No. 38.]. If the Forest Service authorizes grazing without first completing a new ESA consultation, it will be in direct violation of the ESA, 16 U.S.C. § 1536(a)(2), and Plaintiffs would be entitled to come to court and seek declaratory and injunctive relief ensuring compliance.

grazing in 2017. Because a new consultation has to take place before grazing can occur, the challenged LOC cannot possibly affect future grazing, rendering Plaintiffs' ESA claim, which is based on the expired LOC, moot.

Plaintiffs argue, however, that the Court can issue declaratory relief stating that the 2014 LOC violated the law. This, Plaintiffs contend, would ensure the Forest Service and FWS do not continue to fail to meet their obligations under the ESA. In support of this argument, Plaintiffs cite to *Johanns*, 450 F.3d 455. In that case, the plaintiff argued the Forest Service failed to re-initiate consultation on the impact of grazing on national forest land. *Id.* at 457. The plaintiff contended the Forest Service was obligated to re-consult due to its failure to comply with certain criteria it had agreed upon "governing the monitoring of grazing's impact on endangered and threatened species living in" the affected area. *Id.* Indeed, the Forest Service and FWS and previously entered into an agreement establishing criteria that would govern grazing in the affected area. *Id.* at 459. The agencies' agreement stated that, "for the life of each ten-year grazing permit, 'yearly conformation throughout the lifetime of the permit must take place to ensure the criteria . . . continue to be met.'" *Id.*

The plaintiff commenced suit, alleging the Forest Service violated the ESA by failing to re-consult with FWS after failing to meet the required criteria for several years. *Id.* Specifically, the plaintiff argued the Forest Service failed to adequately monitor utilization levels on various allotments every year, as required by the agreed-upon criteria. *Id.* After the district court ruled in favor of the Forest Service and the plaintiff appealed the decision with respect to one allotment, the Forest Service re-initiated consultation on the challenged allotment. *Id.* at 460-61. Accordingly, the Forest Service contended the appeal was moot "because the agency re-initiated

consultation . . . [and] as a result of this recent re-consultation, there is no effective relief that the district court can grant." *Id.*

The Ninth Circuit made two critical observations in finding the case was not moot. *Id.* at 462. First, it noted that the case involved a "continuing practice." *Id.* More precisely, the grazing permit was for a period of ten years and continued to obligate the Forest Service to "obtain from FWS annual concurrence that the guidance criteria governing the 'not likely to adversely affect' finding ha[d] been met." *Id.* Second, the court found, "the Forest Service's practice of not complying with the monitoring requirements [was] likely to persist despite the recent re-consultation" because the Forest Service had argued throughout litigation that it was not required to meet the monitoring requirements in the agreed-upon criteria and had asserted the requirements were "'unreasonable.'" *Id.* Hence, the court felt a declaratory judgment stating the Forest Service's actions violated the ESA would help ensure against similar violations because it would govern "the Forest Service's actions for the remainder of the allotment's permit term. . . ." *Id.* Thus, the Ninth Circuit held that the Forest Service failed to show the case was moot. *Id.* at 463.

Here, Plaintiffs argue the 2014 LOC is "arbitrary, capricious, an abuse of discretion, and not in accordance with the ESA. . . ." Compl. ¶ 141. Plaintiffs thus ask the Court to declare the 2014 LOC failed to adequately comply with the ESA, vacate the 2014 LOC, and order the Forest Service to re-initiate consultation with FWS. The 2014 LOC has expired, however, and the 2014 LOC is no longer operative. Because of this, the Forest Service must re-initiate consultation with FWS before future grazing can take place on any of the challenged allotments, precisely the relief Plaintiffs seek.

As in *Johanns*, Plaintiffs do also seek a declaration that the 2014 LOC violated the ESA—but, here, such a declaration would be superfluous. In *Johanns*, the Forest Service had a continuing obligation to adhere to annual monitoring requirements and to obtain annual concurrence of compliance from FWS; thus, a declaratory judgment stating the Forest Service's failure to take such actions violated the ESA made sense. That is, because of the continuing obligation, a declaratory judgment stating the Forest Service had an obligation to adhere to annual monitoring requirements and to obtain annual concurrence of compliance from FWS would ensure "the Forest Service's actions for the remainder of the allotment's permit term" would be in compliance with its permit and, by extension, the law. *Johanns*, 450 F.3d at 462-63.

By contrast, here, as discussed, the Forest Service is precluded from continuing to adhere to the 2014 LOC; the Forest Service and FWS must engage in an entirely new consultation process to determine if grazing would adversely affect suckers or their critical habitat. Thus, any statement as to the now-expired and unenforceable LOC's legality would be meaningless. And while it is certainly possible that the new consultation will fail to "'remedy the alleged failures'" in the prior consultation, Pls.' Reply in Supp. of Their Mot. for Summ. J., at 12 (quoting *Conservation Congress v. Finley*, 774 F.3d 611, 618-19 (9th Cir. 2014)), there is, as of now, no new consultation, and therefore no way of knowing whether the alleged failures will be remedied. The fact that the agencies might fail to remedy alleged failures in a future consultation "does not establish a basis for continuing jurisdiction." *Nw. Envtl. Def. Ctr. v. Allen*, Civ. Nos. 05-1279-AA, 06-1190-AA, 06-1584-AA, 2007 WL 1746333, at *2 (D. Or. Jun. 13, 2007). Once a new consultation is complete, the Plaintiffs are free to "file a new complaint if the need arises," *id.* at *3, but until such time, the Court lacks jurisdiction to hear Plaintiffs' ESA claim. Such was the ruling in *Natural Desert*, where the plaintiffs also argued for declaratory relief in order "to

'ensure that the new BiOp complie[d] with the law and d[id] so in a timely manner'" and to "'clarify and settle' defendants' legal obligations." *Or. Nat. Desert Ass'n*, 2007 WL 1072112, at *5. The Court reaffirms its holding there that "such justifications are so vague as to make Article III's 'case or controversy' requirement meaningless."[5] *Id.* Plaintiffs' ESA claim is therefore moot, and Summary judgment must be granted in Defendants' favor.[6]

### III. National Forest Management Act

Plaintiffs contend the Forest Service violated NFMA when it issued its 2013, 2014, and 2015 AOIs. They contend the Forest Service ignored its duty under NFMA to comply with the Inland Native Fish Strategy ("INFISH") "by ignoring widespread evidence of riparian problems. . . ." Pls.' Mot. for Summ. J., at 25. Plaintiffs point out that INFISH requires the Forest Service to "'modify grazing practices . . . that retard or prevent the attainment of [Riparian Management Objectives ("RMOs")] or are likely to adversely affect inland fish' and to 'suspend grazing if adjusting practices is not effective in meeting RMOs.'" Pls.' Mot. for Summ. J., at 26 (quoting P 2850). They argue the Forest Service ignored data indicating riparian conditions on numerous streams throughout the challenged allotments were and are below RMO attainment, "with stagnant or worsening trends due to grazing." Pls.' Mot. for Summ. J., at 26. Thus, by failing to adjust grazing in order to attain RMOs, the Forest Service failed to comply with INFISH and, by extension, NFMA.

Defendants and Intervenor-Defendants assert Plaintiffs' argument is based on supposed INFISH violations at individual streams within the challenged allotments, but "INFISH

---

[5]In addition, it should be noted that this case is distinguishable from *Oregon Wild v. U.S. Forest Serv.*, 193 F. Supp. 3d 1156 (D. Or. 2016). In that case, this Court found the plaintiffs' ESA claim was not moot because, unlike here, the "challenged consultation [was] currently operative and [would] remain so through the upcoming grazing season." *Id.* at 1165. Accordingly, *Natural Desert* is more similar, and the Court reaffirms its holding in that case.

[6]Because the Court finds the claim is moot, it declines to address the substance of the claim—*i.e.*, that FWS's LOC is arbitrary, capricious, an abuse of discretion, and not in accordance with the ESA.

consistency is not required allotment-by-allotment or stream-by-stream"; rather, "conclusions related to consistency with INFISH are made at a watershed level," and Plaintiffs provide nothing to suggest the Forest Service violated INFISH at a watershed level. Defs.' Reply in Supp. of Their Cross-Mot. for Summ. J., at 36. In the alternative, Defendants and Intervenor-Defendants argue "there is ample evidence in the administrative record that shows RMOs are being attained. . . ." Intervenor-Defs.' Cross-Mot. for Summ. J., at 14 [ECF No. 35.].

NFMA requires the Forest Service to develop and maintain a comprehensive Land and Resource Management Plan (forest plan) for each national forest. 16 U.S.C. § 1604(a). A forest plan is "a broad, long-term planning document . . . [that] establishes goals and objectives for management of forest resources." *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1014 (9th Cir. 2012) (citing 16 U.S. C. § 1604(g)(1)-(3)). Once a forest plan is adopted, all subsequent agency actions must comply with it. 16 U.S.C. § 1604(i). The Forest Service's "interpretation and implementation of its own forest plan is entitled to substantial deference." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012) (internal citations omitted).

It is undisputed that the forest plans for the Fremont-Winema Forests include an INFISH aimed at achieving desired conditions for suckers, as well as all other inland native fish species. P 5553. In *Oregon Wild v. U.S. Forest Serv.* ("*Oregon Wild I*"), a similar case, the plaintiffs argued AOIs violated NFMA by "contributing to violations of INFISH's water temperature RMO. . . ." 193 F. Supp. 3d. at 1171. In finding that the Forest Service reasonably evaluated INFISH-relevant data, this Court noted that the plaintiffs' claim failed for two overarching reasons. *Id.* First, the plaintiffs failed "to demonstrate that permitted grazing [was] responsible for noted exceedances"; and second, the plaintiffs' "narrow and rigid application of the RMOs depart[ed] from the strategy's text." *Id.* As this Court stated, "INFISH contemplates that its

objectives are 'targets' that will not be met instantaneously" and "[t]he attainment of RMOs is to be assessed on a watershed level." *Id.* Thus, due to "INFISH's flexible approach," and absent any evidence tending to show the water temperatures the plaintiffs complained of constituted "'landscape-scale' problems," not mitigated by other long-term effects, this Court determined that the AOIs did not violate INFISH's temperature RMO and, by extension, NFMA. *Id.*

Here, Plaintiffs' NFMA claim fails for the same two reasons. First, Plaintiffs fail to demonstrate that grazing on the challenged allotments is the culprit for any failure to attain INFISH RMOs. Plaintiffs state "streams within these geographically widespread allotments have not attained multiple RMOs and are not recovering at a near-natural rate," Pls.' Mot. for Summ. J., at 26, but even if this were to be considered true, they fail to provide evidence countering the Forest Service's 2002 assessment not only that "from the 1960s to present, conditions on some of these riparian areas have been dramatically improved even with the continued grazing," but also that "[i]t is important to note that trends in the sites with little or no grazing are not significantly different th[an] those in grazed sites." FWS 7035. This would tend to indicate grazing is not the reason for any failure to attain RMOs in streams found on the challenged allotments.

Plaintiffs do point to evidence that certain creeks, or portions of creeks or allotments, have experienced degraded conditions due to grazing, *see* Pls.' Mot. for Summ. J., at 27-28 (quoting P 5398), but there is nothing to indicate that grazing is contributing to any failure to attain INFISH RMOs at a watershed level and thus nothing to challenge the Forest Service's assessment that overall trends on grazing and non-grazing sites are largely the same; indeed, the Forest Service's 2002 assessment was later reaffirmed by the Forest Service 2009 EA, which found that "grazing effectiveness monitoring shows that stream channel conditions are trending upward under the current grazing program []." P 5597. Given Plaintiff's lack of watershed-level

evidence challenging this assessment, and because "substantial deference" is given to the Forest

Service in interpreting the requirements of its own forest plan, the Court does not believe its

assessment and decision to issue the challenged AOIs was arbitrary and capricious.

Furthermore, Plaintiffs fail to provide evidence tending to show any failure to attain

RMOs is a "landscape-scale" problem. Plaintiffs argue that failure to attain 80 percent bank

stability in multiple creeks, including Barnes Valley Creek, North Fork Willow Creek, Horse

Canyon Creek, and Wildhorse Creek, demonstrates a landscape-scale problem.[7] Plaintiffs also

point to water-temperature exceedances at multiple creeks as demonstrative of a landscape-scale

problem.

Plaintiffs correctly point out the Forest Service's failure to attain the specific, numerical

goals set out in the RMOs, but like the plaintiffs in *Oregon Wild I*, this "narrow and rigid

application of the RMOs" departs from INFISH's text. As stated in *Oregon Wild I*, INFISH's

approach is a flexible one; its objectives are targets that will not be met instantaneously but over

time. When viewed through this lens, then, it is clear that the Forest Service did not ignore its

duty under NFMA to comply with INFISH. First, multiple creeks, including Barnes Valley

Creek, North Fork Willow Creek, Horse Canyon Creek, and Wildhorse Creek, have indeed failed

to attain 80 percent bank stability, but looking only at the 80 percent figure fails to ignore the

Forest Service's 2009 assessment that:

> Stream channels in all of the allotments have proven to be stable and
> capable of withstanding high streamflow events. Large storm events [] and
> the resulting flood flows did not cause channel degradation or noticeable
> changes in channel morphology within the allotments. Stream channels
> within the allotments are in good condition and are trending upward. These
> conditions were achieved under the current management strategy, which in
> most cases has been in place for over 10 years. The trend toward all streams
> in the allotments maintaining and/or reaching desired future condition is

[7]INFISH's goal is to achieve bank stability of greater than 80 percent. P 2845.

> expected to continue for the next 10 years with the proposed management
> strategy, as it is relatively unchanged from the recent past.

P 5597. In addition, the Forest Service stated that while various factors influence a stream water's temperature, "stream channels and their associated riparian areas on the Forest are on an improving trend. . . . All of the sites are either stable or are improving"; therefore, "the current grazing strategies appear to be maintaining or improving channel morphology which result in stream temperatures that are appropriate for Lost River and shortnose suckers." P 5654. Hence, it appears the Forest Service is on a *trajectory* to reach INFISH's targets, and while Plaintiffs make much of the fact that this assessment was conducted in 2009, prior to the 2013-15 AOIs that are being challenged, the 2009 assessment was intended to "provide guidance for the [] grazing allotments in the project area over the next 20 years." P 5536. Plaintiffs need more than creek-specific observations indicating this assessment has changed to successfully rebut the substantial deference given to the Forest Service's assessment of its own data. Finally, many of the creek assessments Plaintiffs point to as evidence of a failure to attain RMOs actually show improving or stable trends. For instance, Plaintiffs state that failure to attain 80 percent bank stability in Wildhorse Creek, Horse Canyon Creek, North Fork Willow Creek, and Barnes Valley Creek has been a chronic problem, but data show Wildhorse Creek's bank stability improved from 35 percent to 73 percent between 2002 and 2008. *See* P 6891. Meanwhile, Horse Canyon Creek's bank stability was stable at 79 percent between 2002 and 2008, an improvement from 67 percent bank stability in 1997. *See* P 6899. North Fork Willow Creek's bank stability did decrease from a high of 78 percent in 1997 to 67 percent in 1998, though bank stability appears to have stabilized, remaining at 52 percent in both 2002 and 2008; as the Forest Service stated, "the stream was functioning at risk in an upward trend." P 6893. And while Barnes Valley Creek's bank stability decreased from 46 percent in 1997 to 25 percent in 2002, it improved to 39 percent

in 2008. *See* P 6897. In fact, all four of these creeks' overall geomorphology and vegetation trends were stable or functioning at risk but at an upward trend. *See* P 6891, 6893, 6897, 6899.[8] Accordingly, Plaintiffs' evidence is insufficient to demonstrate the AOIs violated INFISH and, by extension, NFMA.

Plaintiffs next argue the 2009 EA, which stated the trend was toward all streams maintaining or reaching desired future conditions, is inapplicable because it fails to take into account subsequent problems with unauthorized grazing on challenged allotments and noncompliance with allotment standards, thus preventing anticipated RMO achievement. The evidence indicates, however, that such exceedances are not widespread and that the Forest Service has addressed isolated incidents of overgrazing. Indeed, the Forest Service's end-of-year monitoring of the challenged allotments following the 2012, 2013, and 2014 grazing seasons show either general compliance or a detailed description as to why permit holders were out of compliance and a concerted effort by the Forest Service to work with permit holders to achieve compliance. *See, e.g.*, HF 301-02, 326-27, 334-35; PL 463-66, 1118-19, 1142-43; WH 634-36, 672-73, 696-99; YV 1002-1003, 1037-38. On allotments where over-utilization was a persistent problem, the Forest Service either suspended grazing the following season or seasons, terminated the permit and granted a permit to a separate permittee, or developed monitoring schedules to achieve compliance. *See, e.g.*, YB 279-280, 220-221, 222-237; PL 1164.

Consequently, it seems INFISH's targets, while not being met instantaneously, will be achieved over time, as anticipated by the 2009 assessment. This is what is contemplated by INFISH's flexible approach; thus, the Court cannot say that the challenged AOIs violated INFISH's RMOs and, by extension, NFMA. Instead, it appears the Forest Service reasonably

---

[8]Plaintiffs also fail to acknowledge data indicating other streams in the area have achieved, exceeded, or are near the desired bank stability percentages. *See, e.g.*, P 6875, 6887, 6895, 6899, 6902, 6904, 6906. Likewise, many streams have stabilizing or improving temperatures. *See, e.g.*, P 6875, 6877, 6879, 6881, 6887, 6893, 6895, 6897.

gathered and evaluated data relevant to INFISH, and issued the challenged AOIs on that basis. Its decision to authorize grazing was therefore neither arbitrary nor capricious.

## IV.     National Environmental Policy Act

Plaintiffs argue the Forest Service violated NEPA in issuing its 2009 EA, an assessment that found grazing would have no significant impact on the area assessed, clearing the way for continued grazing on the challenged allotments. Plaintiffs contend the Forest Service's EA did not "assess the combined effects of grazing and water storage activities on shortnose suckers . . . , in violation of NEPA." Pls.' Mot. for Summ. J., at. 29. Plaintiffs contend that failure to consider the combined, or cumulative, effects of a proposed action renders an EA arbitrary and capricious.

In response, Defendants and Intervenor-Defendants point out that Plaintiffs, who participated in the public NEPA process by providing comments on the Forest Service's analysis, failed to administratively appeal the Forest Service's finding of no significant impact, and failed to raise their "cumulative effects" argument during the public NEPA process. By failing to use these available avenues to challenge the Forest Service's assessment prior to filing suit, Defendants and Intervenor-Defendants argue, Plaintiffs are precluded from challenging the Forest Service's decision under NEPA. Defendants and Intervenor-Defendants argue in the alternative that the Forest Service did assess the combined effects of livestock grazing and water storage and diversion equipment on shortnose suckers, and, accordingly, their 2009 EA was not arbitrary and capricious under NEPA.

### A. Failure to exhaust administrative remedies

"The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c). Pursuant to these goals, NEPA requires federal

agencies to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment. . . ." 42 U.S.C. § 4332(C). An agency may first prepare an EA, however, to determine whether it must prepare an EIS or whether it may issue a Finding of No Significant Impact ("FONSI"). 40 C.F.R. § 1508.9(a)(1). If the agency issues a FONSI, then it may proceed with the proposed action. *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004). An agency's decision to forego preparing "an EIS can be set aside only upon a showing that it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 763 (2004) (quoting 5 U.S.C. § 706(2)(A)).

In order to retain the right to challenge an agency's compliance with NEPA, the APA requires the challenging party to exhaust administrative remedies prior to bringing suit in federal court. 5 U.S.C. § 704; *Great Basin Watch v. Hankins*, 456 F.3d 955, 965 (9th Cir. 2006) ("This requirement [of administrative exhaustion] applies to claims under NEPA"). Challengers "have exhausted their administrative appeals if the appeal, taken as a whole, provided sufficient notice to the agency to afford it the opportunity to rectify the violations the plaintiffs alleged.'" *Great Basin Watch*, 456 F.3d at 965 (quoting *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 899 (9th Cir. 2002)). Requiring administrative exhaustion guards against premature claims and helps ensure the agency is provided "'a chance to bring its expertise to bear to resolve a claim.'" *Id.* (quoting *Dombeck*, 304 F.3d at 900).

Plaintiffs do not dispute they failed to exhaust administrative remedies, but argue they were not required to do so because "an administrative appeal of the [Forest Service's] EA would not have stopped the challenged grazing, and therefore exhaustion is not required under [] *Darby v. Cisneros*, 509 U.S. 137 (1993). . . ." Pls.' Reply in Supp. of Their Mot. for Summ. J., at 27. In

*Darby*, the Supreme Court assessed the question of when federal courts have the authority to mandate that a plaintiff exhaust administrative remedies prior to seeking judicial review under the APA. 509 U.S. at 138. The Court held that "an appeal to 'superior agency authority' is a prerequisite to judicial review *only* when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review." *Id.* at 154 (emphasis in original). In other words, under the second part of the test, if the statute or agency rule requires appeal before judicial review, the statute or rule must also provide that the administrative action ceases upon filing of an appeal. *Gifford Pinchot Task Force v. Perez*, No. 03:13-cv-00810-HZ, 2014 WL 3019165, at *5 (D. Or. July 3, 2014).

In *Conservation Congress v. U.S. Forest Serv.*, the plaintiff brought suit alleging the Forest Service violated NEPA, NFMA, and the ESA by permitting a timber sale in northern spotted owl critical habitat. No. 13-cv-01922-TLN-CMK, 2014 WL 6610884, at *1-*2 (E.D. Cal. Nov. 19, 2014). The plaintiff did not appeal the project's approval. *Id.* at *1. Accordingly, the defendants argued the plaintiff's claim was barred by its failure to exhaust administrative remedies. *Id.* at *3. The court, however, determined that administrative exhaustion was not required because, in approving the project, the Forest Service had used an Emergency Situation Determination to set the project in motion, which modified the exhaustion requirement. *Id.* at *4. In fact, the invocation of the Emergency Situation Determination allowed logging to take place immediately, and any appeal would not have rendered the administrative action inoperative; thus, the plaintiff was deprived of the opportunity to appeal under the second part of the *Darby* test. *Id.* Consequently, the court found that the plaintiff's claims were not barred by its failure to exhaust administrative remedies. *Id.* at *5.

Here, by contrast, an administrative appeal would have stayed implementation of the Forest Service's decision. Absent an emergency situation like that that existed in *Conservation Congress*, the Forest Service Decisionmaking and Appeals Reform Act "provides for a right of appeal of a Forest Service decision, and for an automatic stay of Forest Service action during appeal." *Id.* at *4 (citing Pub. L. No. 102-381, Title III § 322, 106 Stat. 1419 (1992)).

Plaintiffs challenge the Forest Service's NEPA decision. In doing so, Plaintiffs had the right to appeal under the Forest Service Decisionmaking and Appeals Reform Act, and no emergency situation existed; in fact, in this case, the Forest Service's "Decision Notice" expressly notified interested parties of their right to appeal and that an appeal would stay implantation of the decision: "This decision is subject to appeal pursuant to 36 CFR 215. . . . If an appeal is filed, implementation will not occur prior to 15 days following the date of appeal disposition." P 5689.

Plaintiffs argue, however, that the Forest Service's stay provision was entirely meaningless because grazing would still have continued under the terms and conditions that existed prior to the 2009 EA. They point to the Ninth Circuit' decision in *Idaho Watersheds Project v. Hahn* 307 F.3d 815, 826 (9th Cir. 2002) for the proposition that when grazing would continue under a stay provision, "an aggrieved party shall be allowed to proceed to federal court without being required to endure further administrative proceedings." In *Hahn*, significant changes were made to grazing regulations, including a requirement that all ranchers grazing in the affected area obtain a grazing permit and undergo annual reauthorization. *Id.* at 822. In an effort to comply with these new regulations, the United States Bureau of Land Management ("BLM") issued grazing permits covering the disputed area. *Id.* The BLM also sought to comply with NEPA by stating on the permits that the permits complied with a sixteen-year-old EIS. *Id.*

The plaintiffs, environmental groups, sued, arguing the BLM violated NEPA because it failed to adequately prepare the required environmental documentation before issuing the grazing permits. *Id.* The BLM contended that referencing back to the sixteen-year-old EIS was adequate, but the district court disagreed, determining "new and significant environmental impacts of cattle grazing had arisen in [the disputed area] since the [] EIS [was] prepared," thus requiring supplementation. *Id.*

On appeal, the BLM argued the court lacked jurisdiction because the plaintiffs "failed to exhaust administrative remedies before filing suit. . . ." *Id.* at 824. In finding for the plaintiffs, the Ninth Circuit noted that, while it was undisputed that the plaintiffs did not exhaust administrative remedies, the BLM's administrative appeal regulations were ineffective to render the challenged decision inoperative pending appeal. *Id.* at 825-28. First, the court noted that under the regulations, the aggrieved party was required to file both an appeal and a petition for a stay of the decision, and if the petition were not granted, "then the aggrieved party may seek recourse in federal court without further pursuing available administrative remedies." *Id.* at 825. But even if the petition were granted, the court found, grazing would continue either under the previous year's grazing level, or if no grazing occurred the prior year, the challenged decision would remain in full force and grazing would continue "even while the stay is in effect[.]" *Id.* at 826.

As to those cases where there was no authorized grazing the prior year, the court determined that the BLM's stay provision was "entirely meaningless" because the "grazing would still continue under the terms and conditions of the permit that was being appealed until the appeal was finally decided." *Id.* Because it was meaningless, if no grazing occurred the prior year, the court held that "an aggrieved party shall be allowed to proceed to federal court without being required to endure further administrative proceedings." *Id.* If grazing did occur the prior

year, however, the court found it to be a fact-based inquiry. *Id.* at 827. Because the record was unclear as to whether grazing legally occurred the prior year, the court analyzed it under both scenarios. *Id.* at 826-27.

In finding that the plaintiffs were not required to exhaust administrative remedies even if grazing occurred the prior year, the Ninth Circuit focused on two key facts. *Id.* at 827. First, it noted that "[e]ven if a stay were to be granted, grazing could continue for many years according to the prior year's grazing practices, which harm riparian habitat because they are based on badly out of date management techniques." *Id.* Indeed, the prior grazing practices were found by the BLM to be "responsible for the continued destruction of riparian habitat." *Id.* Second, the court noted that the BLM's regulations established "no time frames or deadlines for grazing permit appeals to be concluded and administrative appeals can languish for years without decision." *Id.* Accordingly, a stay would have "the effect of a multi-year renewal of grazing permits without environmental review and without imposing any measures to protect the environment while appeals are pending." *Id.* As such, the Ninth Circuit held that, under the facts of the case, the plaintiffs did not have to exhaust administrative appeals because any appeal and subsequent stay would not render the administrative action inoperative, as required by *Darby*. *Id.* At 827-28.

Here, the Forest Service's administrative appeal regulations were effective to render the challenged decision inoperative pending appeal; therefore, in contrast to *Hahn*, Plaintiffs were required to exhaust administrative remedies. Plaintiffs contend that even if they had appealed the Forest Service's EA, their appeal would not have stopped the challenged grazing; rather, the Forest Service would have been free, as the BLM was in *Hahn*, to authorize grazing under the previous year's grazing levels while the appeal process played out. Defendants do not appear to

dispute this; instead, they point out that Plaintiffs challenge the 2009 EA and the 2009 EA would have been stayed pending resolution of the appeal.

Defendants are correct. Plaintiff's claim is that the Forest Service's 2009 EA violated NEPA by failing to adequately conduct a cumulative effects analysis. If Plaintiffs had administratively appealed the Forest Service's decision, implementation of the challenged 2009 EA would have been stayed until fifteen days after disposition of the appeal. Pub. L. No. 102-381, Title III § 322, 106 Stat. 1374 (1992). By contrast, in *Hahn*, prior grazing practices were found to be responsible for the continued destruction of riparian habitat that concerned the plaintiffs; thus, any stay granted during the appeals process would have contributed to the very problem the plaintiffs sought remedied by allowing grazing to continue pursuant to "badly out of date management techniques." *Hahn*, 307 F.3d at 827.

Moreover, unlike the appeals process in *Hahn*, which established no time frames or deadlines for conclusion of the appeals process, the Forest Service's regulations expressly state that the disposition of appeals must "be completed not later than 30 days after the closing date for filing of an appeal, provided that the Forest Service may extend the closing date by an additional 15 days." Pub. L. No. 102-381, Title III § 322, 106 Stat. 1374 (1992). Hence, there is no concern here, like there was in *Hahn*, that the granting of a stay will institute "a multi-year renewal of grazing permits without environmental review. . . ." *Hahn*, 307 F.3d at 827.

Accordingly, the facts that prompted the Ninth Circuit to hold that the plaintiffs in *Hahn* were not required to exhaust administrative remedies do not exist in this case. To the contrary, had Plaintiffs appealed, the Forest Service's administrative appeal regulations would have rendered the challenged EA inoperative pending disposition of the appeal. Thus, because Plaintiffs had the right to appeal and their appeal would have stayed the Forest Service's action

pending the appeal's resolution, Plaintiffs were required to exhaust all administrative appeal procedures prior to filing this present claim. Plaintiffs' failure to do so deprives them of the right to challenge the Forest Service's NEPA decision in federal court. *See Darby*, 509 U.S. at 154 (stating that the exhaustion requirement applies when a rule requires appeal and the administrative action is made inoperative pending review). Accordingly, Defendants' and Intervenor-Defendants' motion for summary judgment is granted, and Plaintiffs' is denied.[9]

## V.     Forest Service's duty to supplement 2009 Environmental Assessment

Plaintiffs contend new information has come to light requiring the Forest Service to supplement its 2009 EA under NEPA. Defendants and Intervenor-Defendants argue Plaintiffs' claim fails for two separate reasons. First, they argue Plaintiffs never brought their supplemental NEPA concerns to the Forest Service, and thus their claim fails on threshold grounds, as they did not pursue administrative remedies prior to filing suit. Second, they contend that even if Plaintiffs' claim was procedurally correct, Plaintiffs' supplemental NEPA claim nonetheless fails on its merits because no significant new circumstances or information existed that would have required supplemental analysis.

### A.  Failure to bring supplemental NEPA concerns to the Forest Service

It is uncontested that Plaintiffs failed to notify the Forest Service of their concerns and to request the Forest Service conduct a supplemental NEPA analysis. Plaintiffs argue, however, that no such notice is necessary.

After an agency has prepared an EA and issued a FONSI, an agency must supplement its analysis if there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii); *Idaho*

---

[9]Because the Court finds Plaintiffs failed to exhaust administrative remedies, it declines to address the argument that Plaintiffs failed to raise their cumulative effects argument during the public NEPA process, as well as the argument that that the Forest Service's 2009 EA was neither arbitrary nor capricious.

*Sporting Congress v. Thomas*, 137 F.3d 1146, 1152 (9th Cir. 1998) (holding that an EA must be supplemented in the same manner as an EIS). "There is an obligation to supplement an EA if there remains major federal action to occur and the new information shows that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered." *Or. Nat. Res. Council Action v. U.S. Forest Serv.*, 445 F. Supp. 2d. 1211, 1219 (D. Or. 2006) (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989)).

"Compliance with NEPA is a primary duty of every federal agency; fulfillment of this vital responsibility should not depend on the vigilance and limited resources of environmental plaintiffs." *City of Davis v. Coleman*, 521 F.2d 661, 671 (9th Cir. 1975). The agency and not the plaintiff "has a continuing duty to gather and evaluate new information relevant to the environmental impact of its actions," and this is so even after it has released an EIS or EA. *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1023 (9th Cir. 1980). Thus, to the extent there are significant new circumstances or information that have developed since the Forest Service released its EA that require supplementation of the EA, the Forest Service, not Plaintiffs, had a duty to gather and evaluate the relevant information.

Moreover, "[a]n action to compel an agency to prepare a [supplemental] EIS . . . is not a challenge to a final agency decision," requiring exhaustion of administration remedies, "but rather an action arising under 5 U.S.C. § 706(1), to 'compel agency action unlawfully withheld or unreasonably delayed.'" *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000) (quoting *Or. Nat. Res. Council Action v. U.S. Forest Serv.*, 59 F. Supp. 2d 1085, 1095 (W.D. Wash. 1999)). Hence, in seeking to compel the Forest Service to conduct supplemental analysis, Plaintiffs were not required to bring their concerns to the Forest Service prior to filing suit, or to first exhaust any sort of administrative remedies that may have been available to

them.[10] Because Plaintiffs had no duty to make the Forest Service aware of their concerns prior to filing suit, their claim is procedurally valid, and the Court must reach the merits.

## B. Merits of Plaintiffs' claim that the Forest Service must supplement its NEPA analysis

Plaintiffs outline four main arguments in contending new information has come to light requiring the Forest Service to supplement its 2009 NEPA analysis. First, that in 2012, FWS designated critical habitat for suckers in Gerber and Clear Lake Reservoirs, as well as many of their tributaries. Because suckers' critical habitat was not designated at the time the Forest Service conducted its 2009 EA, supplementation is required. Second, a 2013 FWS reports concluded suckers face a high "threat of extinction and a low recovery potential," FWS 6931 *see also* FWS 6911 (discussing the threat of extinction faced by Lost River suckers), a new determination that requires supplemental analysis. Third, the same 2013 FWS reports, as well as a 2014 BA, noted the duel and interrelated threats of climate change and severe and prolonged drought on suckers species; thus, supplemental analysis is necessary to consider these important determinations, and this is especially true, Plaintiffs argue, because of the fact that the Upper Klamath Basin experienced severe drought from 2012-15. Finally, Plaintiffs allege new information has come to light indicating (1) riparian conditions are not improving as anticipated in the 2009 EA, (2) trespass grazing has been a recurring problem since 2009 in many allotments, and (3) data show many streams are not meeting RMOs.

### 1. Designated habitat

Defendants and Intervenor-Defendants acknowledge that suckers' critical habitat was designated in 2012, after completion of the Forest Service's 2009 EA; however, they point out

_____

[10]To the extent any district court decision suggests otherwise, as Defendants and Intervenor-Defendants contend, it clearly diverges with Ninth Circuit precedent

that the area designated is much less than was originally proposed and considered by the Forest Service in its 2009 EA. Plaintiffs argue, however, that while the designated critical habitat may be smaller in area, there is now designated critical habitat on challenged allotments not previously assessed as such by the Forest Service; they point to four streams located on three challenged allotments that were not designated critical habitat at the time of the 2009 EA. *See* Pls.' Reply in Supp. of Their Mot. for Summ. J., at 34 (citing P 5586; FWS 7201-02). Plaintiffs contend the Forest Service must supplement its 2009 analysis to include an assessment of whether grazing possess a risk to this newly designated critical habitat.

As stated, NEPA requires an agency to supplement its analysis if there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). Here, FWS followed up its critical-habitat designation with a five-year review of shortnose suckers, a five-year review of Lost River suckers, and a revised Lost River sucker and shortnose sucker recovery plan. *See* FWS 6928-6929, 6883-6927, 6739-6882.[11] All three assessments concluded that "significant threats to [] sucker[s] remain," FWS 6956, 6911, but grazing was not one of the identified threats. And while the revised recovery plan provided numerous recovery actions that if taken might help the fishes recover, none of the proposed actions included grazing revisions in the Sprague and Clear Lake watersheds—an area that encompasses the allotments challenged in this case. *See* FWS 6809-23. Hence, the allegedly significant new information provided by FWS did not bear on grazing or its impacts, obviating any need by the Forest Service to supplement its NEPA analysis on the effects of grazing in the Clear Lake watershed.

---

[11]In arguing new information has come to light warranting a supplemented NEPA analysis, Plaintiffs only mention the five-year review of the shortnose sucker and the Lost River sucker and shortnose sucker recovery plan. In examining whether a supplemental NEPA analysis was required, the Court also examined the five-year review of the Lost River sucker, which, like the five-year review of the shortnose sucker, was conducted in 2013. *See* FWS 6883-6927.

## 2. 2013 FWS report

FWS's aforementioned shortnose sucker five-year recovery plan concludes that "significant threats to the shortnose sucker remain," and that shortnose suckers "face[] a high degree of threat of extinction and a low potential for recovery." FWS 6931. FWS's alarming assessment, Plaintiffs contend, rises to the level of significant new information. While FWS concluded that significant threats to shortnose suckers' viability remain and thus that their chance of extinction is high, it did not identify grazing as one of those threats; in fact, it made no mention of grazing at all. Accordingly, no "significant new circumstances or information relevant to environmental concerns *and bearing* on the proposed action [grazing] or its impacts" were identified in the FWS's five-year plan. 40 C.F.R. § 1502.9(c)(1)(ii) (emphasis added). Moreover, the 2013 five-year plan follows the same recommendation as FWS's previous five-year plan, published in 2007, which recommended no change in the suckers' listing status. Supp. AR 43; FWS 6956-57. Thus, the species' legal status has not changed since the 2009 EA, and the Forest Service was under no obligation to provide a supplemental analysis to its 2009 EA.

The same can be said for Lost River suckers. While FWS also concluded "significant threats to the Clear Lake sucker remain," and that "the extinction of [Clear Lake suckers] remains a credible possibility," grazing was not identified as one of those threats. FWS 6911. Likewise, no change was recommended to the species' listing status. *See* FWS 6912. Hence, the Forest Service had no duty to supplement its 2009 EA.

## 3. Threat of climate change and severe drought

In its 2013 five-year plans and its 2014 revised recovery plan, FWS stated that "climate change and drought [are] potential threat[s] to shortnose [and Lost River] sucker throughout their range. . . ." FWS 6956; *see also* FWS 6907-08 (discussing climatic effects on Lost River sucker).

Plaintiffs assert that FWS's determination constitutes significant new information that requires supplemental NEPA analysis.

This information is not new. In fact, the Forest Service acknowledged climate change and prolonged droughts pose potential threats to suckers in its 2009 EA. *See, e.g.*, P 5643-44. Plaintiffs argue, though, that the Forest Service's discussion was far too general and that FWS's revelations necessitate a more detailed analysis of these twin impacts on suckers. The Court agrees that the Forest Service's discussion was quite general, but the FWS's five-year plans and its 2014 revised recovery plan, like the Forest Service's EA, states only that "[i]t is difficult to accurately predict how such climatic changes will affect the shortnose [and Lost River] sucker," and that the individual impact of prolonged droughts and of "climate change[] on the status of the species [is] poorly understood. . . ." FWS 6908, 6911, 6953, 6956.

Accordingly, the Court fails to see what new information these assessments provided that required supplemental analysis; this is especially true given the Forest Service's "adaptive management approach that provides flexibility to address inherent uncertainty associated with local effects of climate change," an approach included in the 2009 EA. P 5644. This approach is intended to flexibly address the impact of severe droughts and climate change. *See* P 5644, 5653. Hence, it would seem the Forest Service is routinely re-assessing the impact of drought and climate change and altering grazing practices accordingly. Finally, the fact that a severe drought has occurred in the Klamath Basin from 2012-15 does not, as Plaintiffs suggest, constitute *significant* new information. NEPA's continuing duty to supplement previous environmental documents is not triggered "every time new information comes to light after the [EA] is finalized." *Marsh*, 490 U.S. at 373. Instead, supplementation is required only if "new information shows that the remaining action will affect the quality of the human environment in

a significant manner or to a significant extent not already considered." *Or. Nat. Res. Council Action*, 445 F. Supp. 2d. at 1219 (citing *Marsh*, 490 U.S. at 374). Here, as FWS states, "[h]istoric accounts . . . point to cyclic patterns of drought. . . ." FWS 5294. Moreover, the Forest Service acknowledged the "very likely" future where "average temperatures increase" and "snow pack will be reduced." P 5644. It therefore acknowledged the need for "[f]lexibility to address the inherent uncertainty about local effects of climate change" and the need to "focus on enhancing ecosystem resistance and resilience, as well as actions taken that help ecosystems and resources move in synchrony with the ongoing changes that result as climates and environments vary." P 5643. Thus, because cyclical droughts, even severe droughts, are a recurring phenomenon already known to the Forest Service through historical accounts, and because the Forest Service analyzed the need to enhance ecosystem resilience in the face of a drier, warmer climate, the fact that a drought has occurred is not *significant* new information, and the Forest Service was under no obligation to supplement its 2009 EA.

### 4. Potential new information on riparian conditions, livestock trespass, and RMOs

Finally, Plaintiffs allege new information shows (1) riparian conditions are not improving as anticipated in the 2009 EA; (2) trespass grazing has been a recurring problem since 2009 in many allotments and data suggest cattle are responsible for streambank, stream channel, and riparian damage, contradicting assumptions made in 2009 that grazing was minimal and riparian areas were improving; and (3) data show many streams are not meeting RMOs.

Plaintiffs' arguments that riparian conditions are improving at worsening rates or at rates slower than anticipated in the 2009 EA and their argument that trespass grazing has been a recurring problem are interrelated, so the Court will address them together. In support of both

arguments, Plaintiffs point to the Forest Service's end-of-year monitoring of challenged allotments. As Plaintiffs point out, the Forest Service's monitoring indicates areas of "little riparian vegetation, bank trampling, hoof damage, moderate to heavy use of the riparian areas, . . . high stream temperatures, [and] poor bank stability. . . ." Pls.' Mot. for Summ. J, at 22 (citing to P 6899; YB 78, 108-10, 118-19, 130-152, 165-75, 195, 244-245). All of this is true, but it does not suggest trespass in riparian areas are worsening or improving at slower-than-anticipated rates. The 2009 EA recognized unauthorized, or trespass, grazing would take place, but expected unauthorized use would be minimal. P 5570, 5683. Since 2009, unauthorized use and overuse has indeed occurred, but it does not appear to have increased, and, importantly, the Forest Service has taken corrective action when it has occurred. *See, e.g.*, HF 301-02, 326-27, 334-35; PL 397-400, 411-412, 442-445, 463-66, 1084-85, 1118-19, 1142-43; WH 634-36, 672-73, 696-99.

As for riparian conditions, it appears conditions have not changed substantially since 2009. In fact, the Forest Service's 2014 BA—a document Plaintiffs cite to indicating significant new information has come to light requiring supplementation—points out that "[m]any of the streams . . . are degraded due to *past* land management actions, leading to headcuts that cause the stream channel to incise, which lowers the water table and results in the loss of riparian vegetation that would normally provide bank-stabilizing root mass to prevent erosion." P 7203 (emphasis added). Moreover, "[r]iparian areas in the project areas are recovering from *past* activities, including but not limited to impacts from grazing." P 5565 (emphasis added). Hence, it appears degradation in riparian conditions was attributed to past land management actions. This is not significant new information. Furthermore, that cattle are responsible for streambank,

stream channel, and riparian damage is also not new information; indeed, the Forest Service touched on the issue in its 2009 EA:

> Livestock grazing may degrade riparian habitat by removing riparian vegetation, destabilizing stream banks, widening stream channels, and promoting incised channels. These effects reduce overall cover and structure of the riparian area, and can impact fish habitats. Livestock grazing may impact upland vegetation structure (diversity and abundance) by altering plant community composition.

P 5541. Supplementation is required when significant new information becomes available showing remaining agency action could have a significant environmental effect not already considered by the agency. *Or. Nat. Res. Council Action*, 445 F. Supp. 2d. at 1219. Here, no new information has become available that was not already considered by the Forest Service. Accordingly, the Forest Service was under no obligation to supplement its 2009 EA.

Finally, Plaintiffs argue data show many streams are not meeting RMOs, necessitating supplemental NEPA analysis. This argument is, in effect, the same as Plaintiffs' argument for why the Forest Service failed to comply with NFMA. As explained in that section, INFISH sets forth RMOs for the improvement of important habitat features. P 2843-44. INFISH contemplates a flexible approach; RMO targets are not intended to be met instantaneously, and RMO attainment is to be determined on a watershed level, not on a stream-by-stream basis. *Oregon Wild I*, 193 F. Supp. 3d. at 1171.

That particular streams are not meeting RMOs is not significant new information; instead, it is a variable that the Forest Service already considered in its 2009 EA. As stated in the NFMA section of this opinion, Plaintiffs correctly point out that many streams have failed to attain the specific, numerical goals set out in the RMOs, but Plaintiffs' rigid application of the RMOs departs from INFISH's text and intent. Given INFISH's flexible approach, objectives are targets that will not be met instantaneously but over time, something the Forest Service

recognized in its 2009 EA, stating, "[t]he trend toward all streams in the allotments maintaining and/or reaching desired future condition is expected to continue for the next 10 years with the proposed management strategy, as it is relatively unchanged from the recent past." P 5597. The 2009 EA was intended to "provide guidance for the [] grazing allotments in the project area over the next 20 years." P 5536. Consequently, it was recognized in 2009 that the RMOs in many streams would not be met instantaneously, but improvement was expected to occur over time. The fact that many streams are not currently attaining RMOs, then, is not significant new information requiring supplemental NEPA analysis.[12] Moreover, it is perfectly in line with INFISH's flexible approach. Accordingly, the Forest Service was under no obligation to supplement its 2009 EA.

### a. Summary

For the above-mentioned reasons, the Forest Service was not required to supplement its 2009 EA. Summary judgment on this issue must therefore be granted in Defendants' and Intervenor-Defendants' favor.

### CONCLUSION

For the reasons discussed, Plaintiffs' ESA claim is moot, necessitating summary judgment in Defendants' and Intervenor-Defendants' favor. Additionally, Plaintiffs' NFMA claim fails because the Forest Service reasonably gathered and evaluated data relevant to INFISH and issued the challenged AOIs on that basis. Thus, summary judgment must be granted for Defendants and Intervenor-Defendants on this claim as well. Third, Plaintiffs' NEPA claim fails because Plaintiffs failed to exhaust administrative remedies. Hence, Defendants and

---

[12]As discussed, Plaintiffs also fail to acknowledge data indicating other streams in the area have achieved, exceeded, or are near the desired bank stability percentages. *See, e.g.*, P 6875, 6887, 6895, 6899, 6902, 6904, 6906. Likewise, many streams have stabilizing or improving temperatures. *See, e.g.*, P 6875, 6877, 6879, 6881, 6887, 6893, 6895, 6897.

Intervenor-Defendants are also entitled to summary judgment on this claim. Finally, Plaintiffs'
claim that the Forest Service must supplement its analysis under NEPA fails because no
significant new circumstances or information relevant to environmental concerns exist. Summary
judgment on this issue must therefore be granted in Defendants' and Intervenor-Defendants'
favor as well. Thus, in sum, Defendants' and Intervenor-Defendants' cross-motions for summary
judgment (#32 & #35) are granted, and Plaintiffs' motion for summary judgment (#23) is denied.

## ORDER

For the foregoing reasons, Defendants' and Intervenor-Defendants' cross-motions for
summary judgment (#32 & #35) are GRANTED. Plaintiffs' motion for summary judgment (#23)
is DENIED.

It is so ORDERED and DATED this _____ day of March, 2017.

MARK D. CLARKE
United States Magistrate Judge